[Civ. No. 13284. First Dist., Div. One. Jan. 9, 1947.]

RICHARD F. CARMAN, Respondent, v. LUCILLE F. ATHEARN, Appellant.

Athearn, Chandler & Farmer, Hoffman & Angell and Leigh Athearn for Appellant.

Francis N. Foley for Respondent.

PETERS, P. J.—Plaintiff, alleging that he and defendant owned certain property in San Mateo County in equal parts as tenants in common, brought this action for partition. Defendant, by answer, set up a complete title in herself. She also alleged that on August 8, 1940, plaintiff and defendant were husband and wife, and that on that date they executed a written agreement whereby plaintiff waived all rights he might

have had in the property, except that it was provided that if the property should be sold plaintiff was to receive one-half of the net proceeds after all encumbrances existing on August 8, 1940, had been paid. She also alleged her procurement, by default, of a decree of divorce from defendant, the interlocutory being secured February 17, 1941, and the final decree February 19, 1942, by the terms of which decrees it was determined that there was then no community property of the parties.

The cause proceeded to trial on these pleadings. A short time after submission plaintiff was allowed, over objections of defendant, to file two amendments to conform to the proof. In the first amendment plaintiff alleged the marriage of himself and defendant on June 16, 1932; that they lived together, as husband and wife until June 8, 1940; that the property involved was acquired as their community property; that on June 8, 1940, the parties agreed to separate and orally agreed to divide their community property equally; that it was orally agreed that each would have an undivided one-half interest in the real property here involved; that such property would be sold in a reasonable time and the net proceeds divided equally between them; that this oral agreement was reduced to writing and signed by the parties on August 8, 1940; that in reference to this property the written agreement in paragraph 8 provided: "It is mutually agreed between the parties hereto that, by this agreement no disposition is made of that certain real property of eleven acres (11) in the town of Woodside, San Mateo County, California standing of record in the name of the second party, except that when such property is sold, half ($\frac{1}{2}$) of the net proceeds of such sale over and above the encumbrances against the property at the time of the execution of this instrument shall be paid over and become the property of the first party, and that the one-half which becomes the property of the second party is her separate property free and clear of any claim by the first party."

It is then alleged that the above portion of the written agreement did not express the true agreement of the parties that each was to have a one-half interest in the property; that plaintiff was mistaken as to the effect of the above-quoted provision, he believing that it conformed to their oral agreement; that the mistake was mutual, or, if only on his part, that defendant was aware thereof; that he would not have entered into the agreement had he been aware that the contract did not

provide for an undivided one-half interest in each of the contracting parties; that the August 8, 1940, agreement should be reformed to provide, in accordance with the true oral agreement of the parties that: "It is mutually agreed between the parties hereto, that certain real property of eleven (11) acres in the town of Woodside, San Mateo County, California, standing of record in the name of the second party shall be divided equally between the parties hereto and each shall have an undivided one-half (½) interest therein and that said property shall be sold within a reasonable time and the net proceeds divided equally between the parties hereto."

The second amendment to conform to proof was filed a short time later. Plaintiff here alleged that the oral agreement was fully consummated by the parties; that defendant prepared the August 8, 1940, written agreement with the aid of her attorney, representing to plaintiff that it had been so prepared. and that it corresponded with their oral agreement; that subsequent to the execution of the agreement plaintiff submitted to defendant several offers made to him to purchase the property; that on December 15, 1944, defendant told him that she would not sell; that plaintiff then, for the first time, procured legal advice; that defendant first claimed the property as her separate property in her answer and deposition in the present action; "that at no time prior to said Answer or deposition did plaintiff suspect or have reason to suspect that said defendant did not intend to live up to her agreement or that she claimed or would claim the said written agreement did not correspond to or embody said oral agreement."

Defendant demurred to these amendments and such demurrer was overruled. She thereupon answered, alleging as separate defenses an alleged waiver by plaintiff under the written agreement; that the decree of divorce adjudging that there was no community property was *res judicata* of that issue; that the cause of action for reformation was barred by laches and by the three-year statute for relief from fraud or mistake—§ 338(4), Code of Civil Procedure; and that plaintiff was not entitled to any relief because he did not come into court with "clean hands."

The court found generally in favor of plaintiff, ordered that the agreement of August 8, 1940, be reformed as prayed for by plaintiff and granted plaintiff's prayer for a partition, subject to the liens of designated taxes and deeds of trust.

From the interlocutory judgment of partition defendant appeals, her main contentions being that the divorce judgment is *res judicata* on the "no community property" issue; that plaintiff was improperly permitted to prove an equitable interest in himself after alleging a legal title; that the written separation agreement was conclusive and should not have been reformed; that it was error to have permitted the complaint to be amended to conform to the proof after submission of the cause; that plaintiff was barred from any equitable relief under the "clean hands" doctrine because the evidence shows that the property involved was placed by plaintiff in the name of defendant to defraud his creditors.

Plaintiff testified that he and defendant were married in June of 1932 in Indiana; that at the time of the marriage he was training race horses, while defendant was a buyer for a ladies' apparel shop in Delaware; that at the time of the marriage he was earning about $12,000 a year and had $4,000 of his own money in the bank; that at that time defendant had no property; that in November of 1932 his then employer sold his racing stable and he, the plaintiff, purchased several race horses from him; that he, thereafter, worked for several employers and raced his own horses; that in the fall of 1934 he came to California and raced his horses here; that in 1935 he and his wife purchased a home in Burlingame Hills; that the purchase price was entirely paid for from his earnings; that his wife engaged in no gainful occupation during their married life until two months before their separation, which occurred in 1940; that in 1938 he and his wife exchanged the Burlingame Hills property for a piece of property in Woodside, which is the property involved in this proceeding; that all payments on the Woodside property were made from his earnings; that titles to both the Burlingame Hills property and to the Woodside property were taken in the name of his wife; that the titles to the various horses he owned were taken and raced either under the name of a friend or in the name of his wife; that at the time of trial (July of 1945) he had been a real estate salesman for about four years.

On both direct and cross-examination plaintiff frankly and fairly admitted that he had been married and divorced prior to his marriage to defendant; that he was legally responsible to his previous wife and to their children for their support; that he had agreed to pay for such support an amount based on his earning power when he was earning $12,000 a year;

that after his marriage to defendant his earning power decreased and he was unable to keep up the payments; that his former wife sued him and secured several judgments against him; that he put the titles to the Burlingame Hills and Woodside properties, and to the horses, in the name of defendant so that his first wife could not "reach" such properties; that he did this because if these properties were taken from him he "wouldn't have any capital to make any money with."

Plaintiff also testified that he and defendant separated in June, 1940; that at that time they had the Woodside property, two automobiles, the furniture in the Woodside house and a one-half interest in a horse; that all of this property, with the exception of a couple of pieces of furniture that belonged to defendant, had been purchased from his earnings after marriage to defendant; that before they separated the two parties "agreed to divide everything" fifty-fifty; that pursuant to this agreement each took one of the automobiles and defendant took all of the furniture while he kept the one-half interest in the horse. They orally agreed that the Woodside property should be divided "fifty-fifty." During these discussions and prior thereto the defendant at no time claimed the Woodside property as her separate property. After the terms of the separation agreement had been agreed upon the parties separated. Thereafter, and apparently in anticipation of a proposed divorce action by defendant, the terms of the oral contract were reduced to the writing dated August 8, 1940. In relation to this agreement plaintiff testified that defendant "drew up" the contract and importuned him to sign it; that she told him that she had been assisted in drafting the document by her attorney; that plaintiff signed the document after insisting on a few changes; that he signed it in the belief and understanding that the agreement provided that the Woodside property was to be divided equally between them in accordance with their prior oral agreement. It is paragraph eight of this writing that is involved in this proceeding. The paragraph has already been quoted and it provides only for a fifty-fifty division of the proceeds from the sale of the property and grants plaintiff no interest in the property itself.

The plaintiff further testified that the parties agreed that the property would be sold "when we could get a good price for it"; that subsequently he approached defendant with several offers he had received for the property but she refused

to join in a sale, but at no time did she claim the property as her separate property; that when he presented the last offer defendant told him that she never intended to sell, that she would not sell and that there was no way he could make her sell; that she claimed the agreement did not provide for a sale date but did not claim the property as her own; that he thereafter instituted the partition suit; that the first time he ever knew that she claimed the property as her own was when his counsel showed him defendant's "deposition," by which he was probably referring to defendant's answer, in which she alleged sole title in herself.

Defendant contradicted most of this evidence of plaintiff. She testified that respondent read the August 8, 1940, agreement before he signed it and told the notary that he understood it; that the original horses brought to California were a gift to her from her cousin; that the Burlingame Hills and Woodside properties were acquired with her earnings from these original horses; that she did not tell plaintiff that she had consulted an attorney in drafting the August 8, 1940, agreement; that she drew up the original agreement but took the terminology from a form book; that in order to settle their affairs she was willing to "allow" plaintiff a one-half interest in the proceeds from the sale of the Woodside property; that in that agreement she did not describe the Woodside property as her separate property because there was "no point in writing it" and "it never occurred to me"; that she did tell plaintiff he had no interest in the Woodside property; that plaintiff suggested the disputed clause of the agreement.

The plaintiff and defendant were the only two witnesses. As the above brief summary of their testimony indicates, in most vital respects their stories were diametrically opposed. It was the function of the trial court to pass on the credibility of these witnesses. The trial judge saw these two parties, he observed their demeanor on the witness stand, and he has determined the facts in accordance with the testimony of the plaintiff. This court cannot disturb these findings based on such a record. We must accept as true the story told by plaintiff, and must indulge in all reasonable inferences deducible from that evidence. We must assume that the trial court disbelieved defendant and we must disregard her testimony, not only where her story directly conflicts with that of plaintiff but even as to facts testified to by her and not contradicted by plaintiff. On this appeal, defendant, while con-

ceding that these rules apply, nevertheless argues several points which are fundamentally based on the testimony of plaintiff. These points will not be further considered.

The judgment roll in the divorce action of the parties was admitted into evidence. In the complaint it is alleged that there was no community property of the parties, and plaintiff concedes that in that action it was determined that there was no such community property. Based on this premise, defendant now argues that this determination in the divorce action is *res judicata* of the issue that the Woodside property was not community property at the date of the divorce decree. This contention is undoubtedly correct. (*Brown* v. *Brown*, 170 Cal. 1 [147 P. 1168]; *Allen* v. *McCrary*, 220 Cal. 508 [31 P.2d 388]; *Callnon* v. *Callnon*, 7 Cal.App.2d 676 [46 P.2d 988].) Based on these cases defendant objected in the court below to the introduction of any testimony that the Woodside property had been acquired with community funds, claiming not only that plaintiff was thus seeking to show that the Woodside property was community, but also that he was attempting to prove an equitable title when he had alleged a legal one, which cannot lawfully be done. (*Spader* v. *McNell*, 130 Cal. 500 [62 P. 828].) These objections were overruled below and the evidence admitted. Defendant contends that these rulings were erroneous.

The trial court properly admitted the evidence. The contentions of defendant disregard the issues involved below and the purpose of such testimony. Plaintiff at no time has claimed that the Woodside property is now community property. He claims and the trial court found that he owns an undivided one-half interest as a tenant in common. The determination in the divorce action that there was no community property was not a determination that the parties did not then hold property in common. The issues before the trial court were whether the parties had agreed to hold the Woodside property in common and whether the agreement of August 8, 1940, had mistakenly failed to so provide. The evidence that the property was originally acquired with community funds was clearly relevant on these issues. The basis of acquisition has a direct and definite bearing upon the likelihood of the existence of the claimed agreement. If the property had in fact been originally property of the community, even though taken in defendant's name to defeat plaintiff's creditors, such fact lends some support to plaintiff's contention

that upon separation the parties agreed to equally divide the property. Quite clearly, if such were the fact, the parties would be far more likely to have agreed to divide the property equally than they would have been had the property been the sole and separate property of the defendant. The evidence was not admitted to prove that the property was now community property, but only for what light it might throw on the basic question as to whether the parties had in fact agreed to divide it equally.

Defendant strenuously objects to the ruling of the trial court made after submission of the cause permitting the filing of the two amendments to conform to the proof by which reformation was sought. Defendant urges that the allowance of the amendments "materially prejudiced" her defense. The record does not support her contention. It demonstrates that there was a full and complete hearing on the nature of the oral agreement and the circumstances under which the written agreement was executed. After the allowance of the amendments defendant did not seek to set the submission aside for the purpose of introducing additional evidence, nor is it seriously suggested that any other evidence on the basic issues was available. The allowance of amendments to conform to the proof rests in the sound discretion of the trial court. This is so even where, as here, the motion is not made until after submission of the cause. (*Stoops* v. *Pistachio,* 70 Cal.App. 772 [234 P. 423] ; *Lee* v. *Murphy,* 119 Cal. 364 [51 P. 549, 955] ; §§ 469 and 470, Code of Civil Procedure; see cases collected 21 Cal.Jur. p. 211, § 144.) The greatest liberality is to be encouraged in the allowance of such amendments in order to see that justice is done. (See cases collected 21 Cal.Jur. p. 209, § 143.) The record here shows that defendant could not have been legally prejudiced by the allowance of the amendments. She was given a full, fair and ample opportunity to introduce all relevant evidence on the issues. Her counsel cross-examined plaintiff at length on the issues and she testified at length as to her version of the facts involved. As found by the trial court on substantial evidence the case is simply one where the parties orally agreed that certain property should be held in common and then one of the parties prepared, with legal advice, a written document representing that it expressed the oral agreement. The other signed the agreement in the honest and reasonable belief that it so provided and filed his action in such belief. It was

not until after the answer was filed that he discovered his mistake. He should have then moved to amend, but his failure to do so cannot be held to be fatal where the issues involved were fully and completely gone into on the trial. The permission to file the amendments was clearly in the interests of justice and within the discretionary powers of the court.

The defendant also contends that on the merits it was error to grant reformation in this case. She argues that for the court to substitute for the written agreement the oral agreement intended to be expressed by paragraph eight does violence to the statute of frauds requiring agreements relating to the transfer of real property to be in writing. This contention is clearly without merit for the obvious reason that by the reformation the court was not "substituting" the oral agreement for the written, but merely reforming the written by making it conform to what the court was convinced, and the evidence shows, had been the true intent of the parties, but which had by mutual mistake or the fraud of defendant been incorrectly expressed. Moreover, such executed agreements between husband and wife affecting their interests in property need not be in writing in this state. (See cases collected 3 Cal.Jur. 10-Yr.Supp. p. 640, § 126.)

It is next urged that the cause of action for reformation was barred either by the statute of limitations or by laches in that plaintiff did not seek reformation until five years after the written agreement was entered into. The point is without merit. The amendment to the complaint fully alleges the time and circumstances under which plaintiff discovered that the written agreement erroneously expressed the intent of the parties. It was a question of fact for the trial court to determine whether plaintiff reasonably relied on the representation of the defendant that the writing conformed to the oral agreement. In this connection the court was entitled to consider the evidence that defendant represented the agreement had been prepared with legal advice and that she did not claim the property was hers. It was for the trial court to determine under the facts whether plaintiff's failure to understand the document was reasonable. (See cases collected 22 Cal.Jur. p. 726, § 14.) Under the circumstances the determination of the trial court on these issues is conclusive. (*Krone* v. *Insurance Co. of North America,* 218 Cal. 556 [24 P.2d 459]; *Hart* v. *Walton,* 9 Cal.App. 502 [99 P. 719]; *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958].)

■ It is next urged that it was error to reform paragraph eight because such paragraph is not ambiguous, and, so it is contended, an agreement clear on its face cannot be reformed. This is merely another way of urging that plaintiff should have known what he was signing when he signed the document. Such a contention loses sight of the main purpose of reformation which is to make a contract which, through mistake or fraud, fails to express the true intent of the parties, express such intent. Ambiguity has nothing to do with the question as to the right to grant reformation, although it may have on the issue of laches, already discussed. (See cases collected 45 Am.Jur. p. 584, § 2.) Certainly section 3399 of the Civil Code places no such limitation on the power. That section provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (See generally cases collected 22 Cal.Jur. p. 711, § 3 et seq.)

In the only case that we have found where the court considered the point worthy of discussion it was held that: "The plaintiff's contention that the right to reform a written instrument exists only where there is something doubtful or ambiguous upon the face of the writing has, we think, no support in authority." (*Hausbrandt* v. *Hofler*, 117 Iowa 103 [90 N.W. 494, 495, 94 Am.St.Rep. 289].)

■ It is next urged that even as reformed paragraph eight of the written instrument does not give plaintiff any interest in the Woodside property, but only an interest in the proceeds. As reformed the paragraph provides that it is mutually agreed that the Woodside property standing in the name of defendant "shall be divided equally between the parties hereto and each shall have an undivided one-half ($\frac{1}{2}$) interest therein." It is then provided that upon the sale of the property the net proceeds shall be divided equally. Defendant places her main reliance on this last clause, contending that it demonstrates that no present conveyance was intended. This is a matter of intent as disclosed by the words of the instrument. No precise words are necessary to constitute a present conveyance. (See cases collected 9 Cal.Jur. p. 107, § 13; 4 Tiffany on Real Property (3d ed.), p. 44, § 971; 1 Devlin on Real Estate

(Deeds) (3d ed.), p. 306, § 211; 16 Am.Jur. p. 469, § 49.)

 Thus, the true question is whether the words heretofore quoted are sufficient to show an intention to pass a present title to an undivided one-half interest in the property. There can be no doubt, in view of the plaintiff's evidence, that the parties intended to recognize the present existence of a one-half interest in the plaintiff. While the interpretation of a document purporting to transfer a present interest in real property may be a question of law, particularly where the rights of third persons are involved, it must be remembered that the present dispute is between the two parties to the contract of August 8, 1940, as reformed, and that it is their intent as disclosed by that document as reformed that the trial court and this court are attempting to ascertain. While the unfortunate use of the phrases "shall be divided" and "each shall have an undivided one-half (½) interest therein" could be interpreted as operating only at some time in the future, such interpretation is not compelled. The purpose of the document demonstrates that this was not and could not have been the intent with which those words were used. The case is not substantially different from *Olson* v. *Cornwell,* 134 Cal.App. 419, where, at page 427 [25 P.2d 879], the court stated: "The contract recited that a settlement of all disputes between the parties had been made, and contained the provision that plaintiffs 'shall have and from now on are entitled to one-sixth (1/6) part and interest each' in the property. It seems clear from the language of the parties that it was the intention to make a present transfer to plaintiffs of an undivided interest in the property; and where the intent is expressed it is sufficient, whatever may be the inaccuracy of expression or the inaptness of the words used, and the courts will give the instrument that effect. [Citing authorities.]"

While the language used in the above contract is somewhat clearer than that here employed the same principle is applicable. The cases which hold that language somewhat similar to that here involved did not constitute a present conveyance all contained language, not here present, indicating that no present interest was intended to be conveyed or involved the rights of third persons. (See *McGarrigle* v. *Roman Catholic Orphan Asylum,* 145 Cal. 694 [79 P. 447, 104 Am.St.Rep. 84, 1 L.R.A.N.S. 315] ; *Scott* v. *Woodworth,* 34 Cal.App. 400 [167 P. 543] ; *Brewton* v. *Watson,* 67 Ala. 121.)

The last major point urged is that it was improper to grant partition because the evidence shows the original deeds to the Burlingame Hills and Woodside properties were taken in the name of defendant in order to prevent plaintiff's first wife and other creditors from collecting their claims against him. Of course, where a debtor has conveyed his property to another for the purpose of defrauding his creditors, he cannot thereafter compel a reconveyance. In such a situation the doors of the equity court are closed to him. The inequity of the original transaction prevents the granting of equitable relief. It is this principle that defendant seeks to invoke in this partition action.

This so-called "clean hands" doctrine is not here applicable for several reasons. In the first place, the evidence here shows that plaintiff has purged himself of his prior fraudulent conduct. His uncontradicted evidence was to the effect that the claims of his first wife have been fully paid. While there was evidence by defendant that plaintiff owed other creditors, plaintiff testified the claims of these creditors had also been settled. The trial court chose to believe plaintiff and to disbelieve defendant. No creditor testified that plaintiff owed him one cent. Under such circumstances the law is well settled that the "clean hands" doctrine has no application. (*Stockwell* v. *McAlvay*, 10 Cal.2d 368 [74 P.2d 504] ; Annotation 4 A.L.R. 44, particularly at p. 59 ; cases collected 30 C.J.S. 487, § 98 ; 2 Pomeroy's Equity Jurisprudence (5th ed.), p. 94, § 399.)

In the second place, the transaction here involved is the reconveyance by the wife to her former husband, not the fraudulent transfer to the defendant. The misconduct which brings the "clean hands" doctrine into operation must relate directly to the transaction concerning which complaint is made. The misconduct must infect the cause of action before the court. Relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court. A party may have relief in connection with a transaction itself untainted although his original title may have been tainted by improper conduct. These principles are well settled. (See *Germo Mfg. Co.* v. *McClellan*, 107 Cal.App. 532 [290 P. 534] ; *Bradley Co.* v. *Bradley*, 165 Cal. 237 [131 P. 750] ; *Western Union Tel. Co.* v. *Commercial Pac. C. Co.*, 177 Cal. 577 [171 P. 317] ; 2 Pomeroy's Equity Jurisprudence (5th ed.), p.

94, § 399; cases collected 30 C.J.S. p. 491, § 98(c); 4 A.L.R. 44 at p. 65.) In the present case the issues before the court involved the August 8, 1940, transaction. As to that transaction the conduct of plaintiff was in no way tainted with any inequitable or improper conduct.

Here the parties who were the participants to the original fraudulent grant have entered into a separate, distinct and different contract relating to that property. By that contract the original fraudulent grantee has conveyed to the original fraudulent grantor, for a valid and legal consideration, a one-half interest in the property. In such a situation the second contract will be enforced. (2 Pomeroy's Equity Jurisprudence (5th ed.), p. 108, § 401(a); Annotation 89 A.L.R. 1166 at p. 1168; see *Foster* v. *Winchester,* 92 Ala. 497 [9 So. 83], for a good discussion of the rule.)

None of the other points raised requires discussion.

The judgment appealed from is affirmed.

Ward, J., and Schottky, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 10, 1947. Shenk, J., and Spence, J., voted for a hearing.